1
2
3
4
5
6
7

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

San Francisco Division

BRENDA HILL, et al.,

              Plaintiffs,

      v.

KAISER FOUNDATION HEALTH PLAN, INC., et al.,

              Defendants.

Case No. 10-cv-02833-LB

**ORDER**

Re: ECF No. 278-2

## INTRODUCTION

Six former employees sued the Kaiser entities for employment discrimination, raising individual and class claims under federal and state law.[1] The parties settled the individual claims and dismissed the class claims without prejudice.[2] The settlement agreement included a fee award for the three attorneys — including Jeremy Friedman — who represented the plaintiffs.[3] Mr. Friedman's share was $████.[4] He then sued five of the plaintiffs in state court, alleging that they wrongly compromised his statutory attorney's fees in violation of their fee agreements with

---

[1] Second Amended Complaint ("SAC") — ECF No. 53. Record citations refer to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of documents.

[2] Settlement Agreement — ECF No. 182-5; Stipulation and Order — ECF No. 180.

[3] Settlement Agreement ¶ 2(g).

[4] *Id.*

ORDER (No. 10-cv-02833-LB)

United States District Court
Northern District of California

1    him.[5] The plaintiffs moved in federal court to enforce the settlement agreement, arguing that it

2    resolved the dispute, and Mr. Friedman moved to invoke ancillary jurisdiction over the fee

3    dispute.[6]

4        The court invoked ancillary jurisdiction previously[7] and now denies the motion for additional

5    fees on the ground that Mr. Friedman received his reasonable statutory fees in the settlement

6    agreement. Mr. Friedman signed the settlement agreement and agreed in it that $███ was his

7    reasonable statutory fee. His fee agreements with the plaintiffs do not create an entitlement to

8    more. Even if Mr. Friedman could recover additional fees under the fee agreements or by quasi-

9    contract or *quantum meruit*, the lodestar — the product of the hours reasonably spent and the

10   reasonable hourly rate — does not exceed the fees Mr. Friedman received.

**STATEMENT**

**1.   The Claims**

15       The named plaintiffs are Brenda Hill, Medhanie Berhe, Patsy Hardy, Michelle Mike, Evelynn

15   Jennings, and Rena Harrison.[8] They sued Kaiser — individually and on behalf of a class and a

16   subclass — for violating federal and state laws: Title VII, 42 U.S.C. § 2000e-2 *et seq.*; the Civil

17   Rights Act, 42 U.S.C. § 1981; the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et*

18   *seq.*; and California's Fair Employment and Housing Act ("FEHA"), Cal. Govt. Code § 12900 *et*

19   *seq.*[9] The SAC defines a class and a subclass: (1) "a class of all African-Americans or persons of

20   African descent or origin who were employed by Kaiser . . . to perform certain administrative

---

[5] State Court Compl. — ECF No. 182-4.

[6] Motion to Enforce Settlement Agreement — ECF No. 183; Motion re Ancillary Jurisdiction —
ECF No. 193-3.

[7] 9/1/2015 Order — ECF No. 236 at 20. The court denied the plaintiffs' motion to enforce the
settlement agreement because it had not retained jurisdiction. *Id.* at 9–10. Ancillary jurisdiction
over fee disputes allows the court to address the effect of the settlement agreement. *Id.* at 12.

[8] SAC ¶¶ 7–12.

[9] *Id.* ¶¶ 78–105.

*United States District Court*
*Northern District of California*

and/or clerical functions"; and (2) a subclass of African-American women.[10] The claims are as follows:

| # | Claim and Statutes | On behalf of individuals, class, or subclass |
|---|---|---|
| 1 | Discriminatory employment practices in violation of Title VII and FEHA | All plaintiffs and the entire class |
| 2 | Discriminatory employment practices in violation of Title VII, 42 U.S.C. § 1981, and FEHA | All plaintiffs and the entire class |
| 3 | Discriminatory employment practices in violation of Title VII and FEHA | Plaintiffs Hill, Hardy, Mike, Jennings, and Harrison and the subclass |
| 4 | Discriminatory employment practices in violation of Title VII, 42 U.S.C. § 1981, and FEHA | Plaintiffs Hill, Hardy, Mike, Jennings, and Harrison and the subclass |
| 5 | Failure to accommodate and wrongful discharge in violation of FEHA and the ADA | Plaintiffs Hardy, Mike, and Harrison |

## 2. Case Timeline Through Settlement

Mr. Friedman filed the complaint in June 2010, alleging a pattern of race discrimination by Kaiser.[11] Kaiser moved to dismiss on the grounds that pattern-and-practice claims must be brought as class claims and the plaintiffs otherwise failed to state claims; the district judge dismissed the complaint because it did not give basic notice about what discrimination each plaintiff suffered.[12] The plaintiffs added class claims of race- and gender-discrimination in an amended complaint in March 2011 and a second amended complaint in September 2011; in November 2011, Kaiser challenged the adequacy of the class claims primarily under *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).[13] The district judge denied Kaiser's motion to dismiss without prejudice to raising the issues at class certification.[14] On December 28, 2011, Kaiser answered the complaint.[15]

The parties had several case-management conferences and one discovery motion in 2012.[16]

---

[10] *Id.* ¶¶ 17, 24.

[11] Compl. — ECF No. 1.

[12] ECF No. 14; 3/8/2011 Order — ECF No. 32.

[13] ECF Nos. 35, 42, 53, and 56.

[14] 11/29/2011 Order — ECF No. 67.

[15] Answer — ECF No. 70.

[16] *See* ECF Nos. 75, 81, 103, and 130.

In January 2013, the parties asked for, and the district judge ordered, a settlement conference.[17] In their request, they noted the upcoming expert-disclosure deadlines in February, reported their informal stay of discovery on November 20 to explore settlement, and asked for a formal stay to facilitate settlement discussions and "potentially avoid substantial unnecessary costs."[18] They said that "[w]hile formal discovery is stayed, no party will serve any new discovery or file any discovery motion and no depositions will go forward."[19]

The court had several settlement conferences with the parties.[20] The case settled on December 6, 2013; the parties signed a confidential settlement agreement that day.[21]

### 3. The Settlement

#### 3.1  Settlement Agreement

The parties and all counsel — including Mr. Friedman — signed the agreement and initialed every page.[22] The agreement had programmatic components and provided for a total "Settlement Payment" of $██████ (less the required amount of withholding from wages).[23] Individual settlement payments to the plaintiffs totaled $██████ as follows: Mr. Behre and Mses. Hardy,

---

[17] ECF Nos. 132, 133.

[18] ECF No. 132 at 3.

[19] *Id.* at 4 (signed by Mr. Renneisen for the plaintiffs).

[20] The docket reflects the following settlement conferences: (1) July 8, 2013 (all counsel and parties, 10 hours and 30 minutes); (2) July 9, 2013 (telephone conference with all counsel, 30 minutes); (3) July 17, 2013 (plaintiffs' counsel only, 3 hours); (4) August 6, 2013 (telephone conference with Kaiser's counsel, 30 minutes); (5) September 12, 2013 (plaintiffs' counsel only, 2 hours); (6) September 19, 2013 (telephone conference with Kaiser's counsel, 45 minutes); (6) October 2, 2013 (telephone conference with Kaiser's counsel, 45 minutes); (7) October 23, 2013 (multiple telephone calls and emails with all counsel, 4 hours); (8) October 30, 2013 (all counsel and parties, 13 hours and 25 minutes; and (9) December 6, 2013 (all counsel and parties, 10 hours and 14 minutes). ECF Nos. 150, 151, 153, 156, 160, 163, 166, 170, 172, and 175. The parties spent a total of 45 hours and 39 minutes with the court, negotiating the terms of settlement. Mr. Friedman said at the hearing that the court said it spent over 200 hours. (RT 8/16/2016 110:12-15.) He is mistaken; the court did not say that or spend that time.

[21] Settlement Agreement — ECF No. 182-5; *see* Stipulation and Order — ECF No. 180, ¶ 10.

[22] Settlement Agreement — ECF No. 182-5.

[23] *Id.* ¶¶ 2 (defining the term "Settlement Payment"), 3, 17. The programmatic commitments are ████████████████████████. *See* ECF No. 265-8.

United States District Court
Northern District of California

United States District Court
Northern District of California

1  Harrison, and Mike – $▒▒▒ each; Ms. Hill – $▒▒▒; and Ms. Jennings – $▒▒▒.[24]

2  $▒▒▒ was allocated in attorney's fees and costs to the three plaintiffs' lawyers as follows:

3  Jeremy L. Friedman – $▒▒▒; Gordon W. Renneisen – $▒▒▒; Kendra L. Tanacea –

4  $▒▒▒; and costs – $▒▒▒.[25] The settlement agreement then allocated the fee amounts *pro*

5  *rata* to the individual plaintiffs: "This total amount of attorneys' fees and costs is attributable to

6  claims for attorneys' fees and costs by the individual Plaintiffs calculated on a pro rata basis

7  according to their Individual Settlement Payments as follows:



8        (i) Berhe:       $▒▒▒

9        (ii) Hardy:      $▒▒▒

10       (iii) Harrison:  $▒▒▒

11       (iv) Hill:       $▒▒▒

12       (v) Jennings:    $▒▒▒

13       (vi) Mike:       $▒▒▒ [.]"[26]

14  The settlement agreement also had the following provisions about fees.

15      5. **Entire Compensation**. Plaintiffs and Plaintiffs' Counsel agree that the above
       Settlement Payment shall constitute the entire consideration due them and is in full
16      and complete satisfaction of any and all claims, demands and/or causes of action
       they have or may have against Defendants, including but not limited to any and all
17      claims and/or rights to attorneys' fees whether such claims and/or rights are
       statutory, contractual, equitable, based on common law, or grounded upon any
18      other theory whatsoever. Attorneys' fees were specifically negotiated by the parties
       and their counsel in resolving Plaintiffs' individual claims in the Lawsuit, and the
19      amount of attorneys' fees allocated in this Agreement shall be fully and finally
       deemed to be reasonable attorneys' fees pursuant to any statute under which
20      Plaintiffs may have a right to recover attorneys' fees in connection with the
       Lawsuit. Plaintiffs and Plaintiffs' Counsel further represent and agree that no
21      Plaintiff and no Plaintiffs' Counsel will seek any further compensation or other
       relief from any Defendant for any other claimed damages, costs, or attorneys' fees
22      in connection with the matters encompassed in this Agreement. Plaintiffs further
       agree to assume full responsibility to pay any third-party liens. Plaintiffs represent
23      and warrant that no notice has been given of any third-party liens relating to the
24
25

---

[24] Settlement Agreement — ECF No. 182-5, ¶ 2(a)–(f).

[25] *Id.* ¶ 2(g).

[26] *Id.*. Ms. Jennings's representative action for her deceased daughter was limited to economic damages, which is why the amount is lower. Friedman Decl. — ECF No. 278-4, ¶ 43.

Lawsuit, and as of the date of execution of this Agreement, Defendants have received no such notice. If Defendants receive notice of any third-party liens between the time this Agreement is executed and payment of the Settlement Payment, Plaintiffs agree that Defendants may withhold the amount of the third-party lien or add the name of the third-party to the Settlement Payment check. Plaintiffs acknowledge and agree that they would not be entitled to receive the Settlement Payment above if they did not make the promises that they are making in this Agreement.[27]

17. **No Attorneys' Fees and Costs**. The Parties agree that except as otherwise expressly stated herein, they shall bear their own respective costs and fees, including but not limited to attorneys' fees, expert and consultant fees, and costs that (a) have been incurred in connection with the Lawsuit and the negotiation and execution of this Agreement, and (b) may be incurred at any time in the future to monitor progress relating to the Programmatic Commitments referred to in Section 3 above and set forth in Exhibits A-C. Plaintiffs and Plaintiffs' Counsel expressly waive any claim and/or right to attorneys' fees of any kind against any Defendant or Releasee, including those based on statute, contract, equity, common law, or any other theory whatsoever, and agree that they will not seek any additional attorneys' fees or costs of any nature in connection with the Lawsuit, its settlement, any monitoring, or any follow-up or work of any nature related to any of the matters set forth in this Agreement.[28]

The settlement agreement also had an integration clause:

23. **Entire Agreement**. This Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings between the Parties pertaining to the subject matter of this Agreement. The Parties agree that no change to or modification of this Settlement Agreement shall be valid or binding unless it is in writing and signed by each Plaintiff and a duly authorized officer of Defendants.[29]

### 3.2   Settlement Negotiations

The record also reflects the following about the settlement process.

Mr. Friedman negotiated a three-step, sequential process for settlement discussions: (1) negotiate programmatic relief; (2) negotiate relief for the clients; and (3) address payment of reasonable statutory attorney's fees.[30] Mr. Renneisen talked with Kaiser's counsel Nancy Abell on December 20, 2012, and verified that the negotiations were structured this way:

---

[27] Settlement Agreement ¶ 5.

[28] *Id.* ¶ 17.

[29] *Id.* ¶ 23.

[30] Motion re Ancillary Jurisdiction — ECF No. 193-3 at 14. The court previously rejected Mr.

> Jeremy, the structure of these negotiations [is] shaping up exactly the way we
> want them. Nancy today expressly acknowledged "you guys are not going to be
> able to do anything on fees until you get your clients taken care of." Kaiser still
> may attempt to hold a deal on prospective relief and client relief hostage against
> getting a deal on fees. But at least we know that Kaiser is not going to try to make
> us talk about fees and client relief at the same time.[31]

Mr. Friedman communicated this three-stage process to the plaintiffs on December 13, 2012, and again on May 17, 2013.[32] "After full discussion of the proposal, each plaintiff expressed her or his approval and agreement to the process, including an understanding that there would be no final settlement unless — after there was a negotiation of programmatic relief and individual damages — I agreed to the amount of fees."[33]

Phase 1 was the programmatic relief; counsel negotiated this on their own.[34]

Phase 2 was negotiating damages, which the parties did through negotiations and several conferences.[35] More specifically, "[a]fter we reached agreement with Kaiser on programmatic relief, . . . the parties reached a tentative agreement on the amount of damages" for the plaintiffs "at a level ███████████████████" and "at the high end of what race[-]discrimination claimants expect to recover in settlement, especially where no trial date has been set. Given the infirmities of the individual claims, these amounts represented an extremely attractive offer for settlement of plaintiffs' claims."[36] This happened after two settlement conferences (the in-person settlement conferences on July 9 and October 23) except that Ms. Hill's numbers were adjusted at the last settlement conference in December.[37]

---

Friedman's argument that Kaiser breached the agreement about negotiating settlement. 9/1/2015 Order — ECF No. 236 at 12–19.

[31] Friedman Decl. — ECF No. 278-4, ¶ 40.

[32] *Id.* ¶ 41.

[33] *Id.*

[34] *Id.* ¶ 42.

[35] *Id.* ¶ 43.

[36] *Id.*; *see* Motion re Ancillary Jurisdiction — ECF No. 193-3 at 14–15.

[37] Friedman Decl. — ECF No. 278-4, ¶ 43.

Phase 3 addressed attorney's fees. Mr. Friedman says that he was not allowed to participate in Phase 3 (but he submitted a declaration on fees in July 2013).[38] Kaiser negotiated fees with the plaintiffs' other counsel and on December 6, 2013, at the settlement conference, submitted a detailed written settlement offer with amounts allocated to the plaintiffs and counsel.[39] Kaiser did not negotiate directly with Mr. Friedman about his fees or make a written offer to Mr. Friedman to settle his fees before the December settlement conference.[40]

Pursuant to California Business & Professions Code § 6103.5, which requires an attorney to present his clients with an opposing party's written offer of settlement, Mr. Friedman gave his clients the written settlement offer and explained its provisions.[41] He explained his objections to certain clauses (such as clauses about confidentiality and future employment).[42] He saw his associated counsel give independent advice to the clients.[43] He told them he did not consent to waive statutory fees.[44] He explained that the clients could direct him to consummate the settlement as written, and he would do so over his objections.[45] He explained that "such a direction would create a dispute with [him], one that would need to be addressed and resolved subsequent to the settlement."[46] The plaintiffs directed him to sign the settlement agreement, and he did.[47] The plaintiffs' counsel drafted the Trust Account Agreement (discussed below) to memorialize Mr. Friedman's objections and reservations.[48]

---

[38] Motion re Ancillary Jurisdiction — ECF No. 193-3 at 15.

[39] *Id.*; *see* Friedman Decl. — ECF No. 278-4, ¶¶ 46, 47.

[40] Friedman Decl. — ECF No. 278-4, ¶ 46.

[41] *Id.* ¶ 47.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *Id.* ¶ 49; *see* Settlement Agreement — ECF No. 182-5.

[46] Freidman Decl. — ECF No. 278-4, ¶ 49.

[47] *Id.*

[48] *Id.*

United States District Court
Northern District of California

According to Ms. Tanacea, during the mediation on December 6, Mr. Friedman — in front of the clients and counsel — stated repeatedly "that if the clients settled for the amount offered, he would lose his house and suffer financial ruin. During the course of the day, Mr. Friedman raised his voice and yelled at Mr. Renneisen, the clients and me. His behavior was out of control and frightening. After all the clients instructed him to settle, he signed the operative settlement agreement."[49] He did not withdraw from representing the plaintiffs.[50] Mr. Friedman responds that the clients never asked him to withdraw.[51] Ms. Hill says that he did not raise his voice or yell, and was not "'out of control' in any way. In fact, it was the opposite. . . . At the December 6 settlement conference, I became disgusted . . . when other named plaintiffs turned on Mr. Friedman over his fee claim. . . . [W]e had all agreed — including Ms. Tanacea — that the attorneys fees would be resolved against Kaiser after we had reached an agreement on programmatic relief and our damages, and it would be up to the attorney to settle the amount of fees. Mr. Friedman explained that this was to keep the focus of negotiations against Kaiser, not against each other."[52] Ms. Hill also explains that to settle her benefits claim, the amount came out of fees that otherwise were to be paid to Mr. Renneisen and Ms. Tanacea.[53]

On December 6, 2013 (the same day the parties and counsel signed the settlement agreement), the three plaintiffs' lawyers signed a hand-written "Trust Account Agreement" withholding 37% of the monies allocated to the individual plaintiffs "until either (a) any client and Mr. Friedman agree to the release of funds relating to that client; or (b) any fee claim asserted by J. Friedman against clients is fully resolved."[54] The plaintiffs did not sign the Trust Account Agreement.

Some of the withheld funds were distributed to the plaintiffs (resulting in a 31% withholding), and Ms. Hill resolved her dispute with Mr. Friedman, paying him an additional $▮▮▮▮; this

---

[49] Tanacea Decl. — ECF No. 284-4, ¶ 8.

[50] Opposition — ECF No. 284-2 at 7.

[51] Reply — ECF No. 316-2 at 9; *see* Hill Decl. — ECF No. 324-3, ¶ 5.

[52] Hill Decl. — ECF No. 324-3, ¶ 3.

[53] *Id.* ¶ 4.

[54] Trust Account Agreement — ECF No. 182-6 at 2–3.

ORDER (No. 10-cv-02833-LB)          9

brought his recovered fees to $███████ ($███████ plus $██████).[55] At this point, the withheld

funds totaled $███████ for the remaining plaintiffs, and Ms. Tanacea retained them in her trust

account.[56] After the non-binding arbitration (described below), and with Mr. Renneisen's

agreement, Ms. Tanacea disbursed the funds to the plaintiffs because they never consented in

writing to the withholding of funds that they were entitled to in the settlement agreement.[57]

### 4.   Dismissal of the Case

On December 9, 2013, the parties stipulated to the undersigned's jurisdiction:

> In accordance with the provisions of Title 28, U.S.C. Section 636(c), the
> undersigned parties hereby voluntarily consent to have United States Magistrate
> Judge Laurel Beeler conduct any and all further proceedings in the case, including
> trial, and order the entry of a final judgment and/or dismissal of the entire case.
> Appeal from any judgment shall be taken directly to the United States Court of
> Appeals for the Ninth Circuit.[58]

On December 10, 2013, the parties filed, and the court approved, a stipulated dismissal.[59]

### 5.   Subsequent Arbitration and Litigation

#### 5.1   Non-Binding Arbitration

The plaintiffs sought binding arbitration through the Bar Association of San Francisco

("BASF"); Mr. Friedman requested non-binding arbitration.[60] The BASF panel held a hearing in

January 2015, and in April 2015, issued a non-binding award in favor of the plaintiffs, finding that

a fee of more than $██████ to Mr. Friedman "would be unreasonable."[61] The panel reached its

result in part by a lodestar analysis and in part by reference to the settlement agreement's

integration clause.[62]

---

[55] *See* BASF Non-Binding Arbitration Award, BASF Case No. 14.018 — ECF No. 182-7 at 2, 5.

[56] *Id.*; *see* Friedman Decl. — ECF No. 278-4, ¶ 49.

[57] Tanacea Decl. — ECF No. 284-4, ¶ 10.

[58] Stipulation — ECF No. 176.

[59] Stipulation — ECF No. 178; Stipulation and Order — ECF No. 180 at 8.

[60] BASF Non-Binding Arbitration Award, BASF Case No. 14.018 — ECF No. 182-7 at 5.

[61] *Id.* at 1, 6–7.

[62] *Id.* at 2–7.

The panel held that the fee agreements — excerpted below — did not give Mr. Friedman an absolute right to recover his lodestar.[63] Moreover, under its lodestar analysis, the panel noted that it was not until July 2013 that Mr. Friedman informed the clients that his hourly rates had increased from the $450 in effect in 2007 and 2008 (when they signed the fee agreements) to $785.[64] The panel concluded that this alone supported a finding that his reasonable fee should be less than $785 an hour.[65] It also examined his billings compared to fees given to Mr. Renneisen and concluded that Mr. Friedman "provided little more value to the Clients than . . . [Mr.] Renneisen. . . . This finding is based on (a) the Panel's understanding of the allocation of tasks and responsibilities among the three attorneys working on behalf of Clients, (b) the Panel's review of Attorney Friedman's billing records, which include block billing, high numbers of hours often rounded to the nearest half hour or hour, and a significant number of hours expended after settlement was likely or very likely, and (c) examples of work that appear[] not to have significantly benefited Clients, such as efforts to increase the fee beyond the general ballpark of lodestar (in light of the limited funds available in the settlement) and drafting [the] Third Amended Complaint before the final mediation[,] which 2nd Chair Attorney Renneisen and 3rd Chair Attorney Tanacea testified was unnecessary and fee generating."[66] It concluded that a fee of more than $███████ was unreasonable.[67]

The panel also held that the only document binding on Mr. Friedman and the plaintiffs was the settlement agreement, which had an integration clause that said that the settlement payment (including fees) was the only payment due to the plaintiffs and their counsel.[68]

---

[63] *Id.* at 5.

[64] *Id.* at 2, 5.

[65] *Id.* at 5.

[66] *Id.*

[67] *Id.*

[68] *Id.* at 6–7.

In sum, the panel held that there was no basis in law or fact to support Mr. Friedman's request for additional fees beyond $█████.[69] It also awarded $████████ in interest to the plaintiffs on the withheld amounts.[70]

### 5.2   State Court Lawsuit and Proceedings Here

"As required by law, within 30 days of service, Attorney Friedman filed his rejection of the award and initiated a complaint in Superior Court" against all plaintiffs except Ms. Hill (because he settled his fee dispute with her for $████).[71] On May 20, 2015, the five plaintiffs who were the defendants in the state lawsuit filed a motion in federal court to enforce the settlement agreement to preclude Mr. Friedman from litigating the issue regarding fees in state court.[72] Mr. Friedman opposed the motion, asked the court to invoke its ancillary jurisdiction to resolve the fee dispute, and stayed his state lawsuit against the plaintiffs.[73]

The court invoked ancillary jurisdiction over the fee dispute.[74] It denied Mr. Friedman's motion for additional attorney's fees from Kaiser on several grounds, including the provisions in the settlement agreement that the fees were his statutory reasonable fees and he waived his right to seek additional fees from Kaiser.[75] The court also ordered more briefing, primarily to set up the issues more linearly: (1) the enforceability of the fee agreements; (2) the theories for recovery (such as a *quantum meruit* claim) if they were not enforceable; and (3) the exact amount of Mr. Friedman's demand from the client, and the basis for it in a lodestar analysis.[76] Earlier briefing addressed some of the issues (such as the enforceability of the fee agreements and the effect of the

---

[69] *Id.* at 7.

[70] *Id.*

[71] Motion re Ancillary Jurisdiction — ECF No. 193-3 at 18.

[72] Motion to Enforce Settlement Agreement — ECF No. 183.

[73] Motion re Ancillary Jurisdiction — ECF No. 193-3.

[74] 9/1/2015 Order — ECF No. 236 at 20.

[75] *Id.* at 12–19.

[76] *See id.* at 20.

settlement agreement) but Mr. Friedman's motions did not make a fixed demand for fees and instead argued his entitlement to statutory fees and a multiplier.

In the additional briefing, Mr. Friedman defined his reasonable fees for 2007 through 2013 as his 2013 billing rate of $725 times 1507 hours for a total lodestar of $1,092,575.[77] (In his initial filings, Mr. Friedman claimed a billing rate of $785 per hour, which is a lodestar of $1,183,230.50, and he applied a 2.0 multiplier, resulting in "a reasonable fee under California law of $2,366.461."[78]) Mr. Friedman claims $▮▮▮▮▮ from the five plaintiffs in this fee dispute, calculated as follows: $1,092,575 minus $▮▮▮▮▮ is $▮▮▮▮▮. He splits this among the five plaintiffs *pro rata* based on their recoveries: 16.9% each for Mr. Berhe and Mses. Hardy, Mike, and Harrison (or $▮▮▮▮ each) and 8.4% for Ms. Jennings ($▮▮▮▮). Thus, the $▮▮▮▮▮ is 76% of $▮▮▮▮; the balance of $▮▮▮▮▮ is attributable to Ms. Hill, which he compromised for $▮▮▮.[79]

For context, as of July 2013, the record shows a claimed lodestar for Mr. Renneisen of $863,579 (1100.1 hours times $785) and for Ms. Tanacea of $167,031 (249.3 hours times $670).[80]

## 6. The Fee Agreements

Mr. Friedman submitted written retainer agreements for four of the five plaintiffs; he does not have a signed fee agreement with Ms. Mike.[81] The fee agreements were signed on the following dates: September 24, 2007 (Jennings); September 25, 2007 (Berhe, Hardy); and February 28, 2008 (Harrison).[82] Each authorizes representation by "Jeremy Friedman, Attorney at Law (sometimes referred to herein as 'Attorneys')," and each "agree[s] that Attorneys may associate with any other attorney or with any law clerk at their discretion in the prosecution of my claim, as long as I

---

[77] Friedman Decl. — ECF No. 278-4, ¶¶ 55, 57; Motion for Attorney's Fees — ECF No. 278-2 at 23, 25.

[78] Motion re Ancillary Jurisdiction — ECF No. 193-3 at 16.

[79] Motion for Attorney's Fees — ECF No. 278-2 at 29 n.20.

[80] ECF No. 182-11 at 34, 38; Friedman Decl. — ECF No. 278-4, ¶ 57.

[81] Friedman Decl. — ECF No. 278-4 at ¶¶ 14–15, 24; Retainer Agreements — ECF No. 265-4.

[82] *Id.* at 4, 8, 12, 16.

United States District Court
Northern District of California

receive prior notification and any such association of counsel will not be the sole cause of any increase in the attorneys' fees I will be required to pay."[83] Each has the following provisions regarding fees:

4. <u>Attorney's Fees</u>

(a) In consideration for the services to be rendered by Attorneys, I agree to pay attorneys' fees as follows:

I shall pay a non-refundable retainer in the amount of $500, which shall be paid in two equal installments of $250 each [the agreement specifies the exact due dates]. . . . This retainer payment shall be treated as a payment of attorney's fees, and when paid shall be immediately subject to full deposit by Attorneys. However, it is the intent of Attorneys and myself that such an amount partially cover anticipated costs through the early stages of the litigation.[84]

(b) All attorneys' fees recovered pursuant to any statutory or common law fee-shifting provisions, Federal and California, for work done in connection with this litigation are property of the attorneys, as provided by California law (*Prentice v. Flannery*) and shall not be regarded as property of the client. Attorneys shall receive all such attorneys' fees recovered, or thirty-three and one third (33 1/3%) of any amount recovered by way of settlement or judgment, whichever is greater. The "amount recovered" shall be the total of all monies recovered, including damages attorneys' fees, interest, or any other characterization, but not including costs.

If my claim is settled thirty (30) days or less before the first scheduled trial or arbitration date, Attorneys shall receive their fee on the same terms contained in this sub-paragraph, except that forty percent (40%) shall be substituted for the thirty-three and one-third percent (33 1/3%) in the first sentence.

(c) If a positive recovery is not made on my behalf in the ultimate resolution of all claims under this agreement, it is understood that nothing will be owed or paid for legal services. It is understood that the attorneys' fees set forth in this agreement are not set by law and were negotiated by me with Attorneys.

(d) The Court may order, or the parties to the litigation may agree, that the defendants will pay some or all of my attorneys' fees, costs, or both. Any such order or agreement will not affect my obligations under this agreement except as stated in this Section regarding calculation of the amount of attorneys' fees owed under this agreement and as stated in Section 6. I agree that any attorneys' fees that may be recovered from defendants in this case shall belong to Attorneys, to whom I assign my rights. I understand that, under California law, the assignment of these

---

[83] *Id.* at 1, 5, 9, and 13.

[84] Only Ms. Harrison was able to document that she paid, and Mr. Friedman cashed, her initial installment of $250. The record otherwise does not show whether anyone else paid, or Mr. Friedman cashed, an initial installment. No one paid the second installment. *See* BASF Non-Binding Arbitration Award, BASF Case No. 14.018 — ECF No. 182-7 at 1.

rights may raise a potential conflict of interest between myself and Attorneys in the context of settlement agreements; I have been advised of this potential conflict, of my option of seeking additional legal counsel in connection with this conflict, and I expressly agree to this assignment.

(e) I have been given the choice of paying monthly for attorneys' fees on an hourly rate basis and for costs, as an alternative to a contingent fee. I understand that if I chose to pay fees on an hourly rate basis, rather than a contingent fee basis, I must pay all fees and costs even if I lose my claims. I knowingly and voluntarily agree to pay fees on a contingent fee basis because I need not pay fees before any amount is recovered and I will not owe any attorneys' fees if I do not prevail against defendants.[85]

. . . .

6. <u>Settlement</u>

It is agreed that no settlement of these claims may be made without my prior agreement. If, in settlement of this litigation, I waive the right to recover attorneys' fees, costs or expenses without the consent of Attorneys, I agree to pay their lodestar fee (their hourly rates as of the date of recovery times the number of hours expended on our case). Friedman's hourly rate for the year 2007 is $450. I understand that this rate will be increased in years subsequent (normally as of January 1st of the new year) to reflect increased costs and the demand for and increase in value of Attorney's specialized legal services.[86]

. . . .

8. <u>Attorneys' Lien</u>

I give Attorneys a lien on all amounts I recover for attorneys' fees, costs and expenses advanced on all claims and causes of action that are the subject of his representation of us under this agreement and on any recovery obtained.[87]

Mr. Friedman did not sign the four agreements that he submitted.[88] His declaration says the following about the retainer agreements:

17. Each written agreement had alternative "hybrid-contingency fee" provisions providing for a percentage contingency fee of the total amounts recovered (either one-third or 40%, depending on the timing of recovery), at the attorney's election. As was explained to and understood among all plaintiffs, the "hybrid-contingency fee" provision would impact on calculation of attorneys' fees only where there is an early settlement, when the amount of statutory attorneys' fees accrued is relatively

---

[85] Retainer Agreements — ECF No. 265-4 at 1–2, 5-6, 9–10, and 13–14.

[86] *Id.* at 3, 7, 11, and 15.

[87] *Id.* at 4, 8, 12, and 16.

[88] *Id.*

United States District Court
Northern District of California

low. By the time settlement was discussed in this action, it was clear that fees had amounted to the point where the "contingency fee" provision would not apply.

18. Given the nature of race discrimination actions, I explained to the plaintiffs that a substantial investment of time would be required by me to litigate this case against Kaiser, and that the form of payment would come in my right and ability to litigate statutory fees through judgment or settlement. I also explained to the plaintiffs that, given the way in which Kaiser had litigated previously, the attorneys' statutory fees would quickly outgrow, and have no direct relationship with, the possible recoveries for the clients in their claims against Kaiser for employment discrimination.

19. Given that settlements and judgments of employment discrimination actions frequently and necessarily include the recovery of substantial attorneys' fees, it was implied in each representation, and expressly written into the retainer agreements, that the Attorney had

a lien on all amounts ... recover[ed] for attorneys' fees, costs and expenses advanced on all claims and causes of action that are the subject of his representation of us under this agreement and on any recovery obtained.

20. I explained to plaintiffs we may be required to pursue settlement of the client's litigation claims at the same time Kaiser seeks to settle statutory fees. I explained to the clients, and all agreed, the attorneys would seek to negotiate possible client recoveries separate from, and prior to, negotiating over reasonable statutory attorneys' fees.

. . . .

22. I explained to all of the clients, and they acknowledged they understood, that in settlement negotiations, the clients would have authority to agree to the amount of their damages, but the attorneys would have authority to agree to the amount of statutory fees. It was explained to and understood among all clients that, in negotiations, the attorneys would seek to have reasonable statutory attorneys' fees determined after settlement of the merits, in a separate fee petition if the parties could not agree. But it was also explained to and understood among all clients that Kaiser might refuse to settle the litigation without negotiating a resolution of the attorneys' claim to statutory fees.[89]

The four plaintiffs who signed retainer agreements all declare that Mr. Friedman never provided them with a signed duplicate copy of their retainer agreement; they all void the fee agreements.[90] All five plaintiffs declare that Mr. Friedman never provided them with a written

---

[89] Friedman Decl. — ECF No. 278-4 ¶¶ 17–20, 22 (alterations in original).

[90] Clients' Declarations — ECF No. 284-3 at 5, 7, 10, and 16.

document withdrawing as counsel and never provided them with his time or with written notice that he was increasing his hourly billing rate.[91]

## ANALYSIS

The issue is whether Mr. Friedman is due additional fees. The parties agree that the analysis turns on whether Mr. Friedman's claimed fees are his reasonable statutory fees (cabined by the lodestar).[92] The court holds that Mr. Friedman received his reasonable fees and is not entitled to more by contract or by statute. The court reaches this conclusion by holding the following: (1) the settlement agreement — signed by all parties and counsel — defined "reasonable statutory fees" as the $███████ allocated to Mr. Friedman; (2) the fee agreements are voidable by the plaintiffs and provide no independent basis for a further recovery; and (3) in any event, the lodestar — the product of hours reasonably spent and the reasonable hourly rate — does not exceed the amount that Mr. Friedman received in the settlement agreement.

### 1. The Settlement Agreement

The plaintiffs assert that by signing the settlement agreement, Mr. Friedman waived his right to seek additional fees because he agreed that the fee award was his reasonable statutory fee.[93]

The settlement agreement fully settled the claims, and it had this provision about the fees paid in settlement: all parties and counsel agreed that the fees were "reasonable attorneys' fees pursuant to any statute under which Plaintiffs may have a right to recover attorneys' fees in connection with the Lawsuit."[94] It also had an integration clause: "This Agreement sets forth the entire agreement between the Parties and fully supersedes any and all prior agreements and understandings between

---

[91] *Id.* at 5, 7, 10, 13, and 16.

[92] Motion for Attorney's Fees — ECF No. 278-2 at 20–30; Opposition — ECF No. 284-2 at 10–14.

[93] Motion to Enforce Settlement Agreement — ECF No. 183 at 6–7; Reply re Motion to Enforce Settlement Agreement — ECF No. 199 at 8; Opposition — ECF No. 284-2 at 10–11.

[94] Settlement Agreement — ECF No. 182-5, ¶ 5.

United States District Court
Northern District of California

the Parties pertaining to the subject matter of this Agreement."[95] Mr. Friedman initialed every page and signed the agreement.

The record shows that Mr. Friedman intended to pursue his remedies against his clients under the fee agreements. He said that he told the plaintiffs that by directing the settlement, they did so over his objections, and they risked a fee dispute with him.[96] And he withheld 37% of their settlement payments, memorializing it with co-counsel in the Trust Account Agreement (discussed above) to reflect his objections and reservations.[97]

But Mr. Friedman's intent is irrelevant if — as the plaintiffs argue — the settlement agreement is an integrated contract that ends all disputes and forecloses further relief under the fee agreements or by quasi contract.[98]

> "The parol evidence rule . . . establishes that the terms contained in an integrated written agreement may not be contradicted by prior or contemporaneous agreements. In doing so, the rule necessarily bars consideration of extrinsic evidence of prior or contemporaneous negotiations or agreements at variance with the written agreement. As a matter of substantive law such evidence cannot serve to create or alter the obligations under the instrument. In other words, the evidentiary consequences of the rule follow from its substantive component — which establishes, as a matter of law, the enforceable and incontrovertible terms of an integrated written agreement.

*Casa Herrera, Inc. v. Beydoun*, 32 Cal. 4th 336, 344 (2004) (citation, alteration, and quotation omitted).

Mr. Friedman counters that a settlement agreement does not foreclose a contract dispute between an attorney and a client over fees.[99] He cites *United States ex rel. Depace v. Cooper*

---

[95] *Id.* ¶ 23.

[96] Friedman Decl. — ECF No. 278-4, ¶¶ 47–49.

[97] *Id.* ¶ 49. The Trust Agreement is relevant only to show Mr. Friedman's intent to seek additional fees. It apparently does not have operative effect. Mr. Friedman perhaps thought he was imposing a lien on settlement recoveries under paragraph 8 of the fee agreements to satisfy the plaintiffs' fee obligation to him under paragraph 6. But his actions operated to divert settlement funds that — under the terms of the settlement agreement — were payable to the plaintiffs. The settlement agreement required the parties to agree in writing to any changes to it; the plaintiffs did not agree to this change. *See* Settlement Agreement ¶¶ 8, 23. Ultimately, Ms. Tanacea and Mr. Renneisen returned the funds to the plaintiffs.

[98] Motion to Enforce Settlement Agreement — ECF No. 183 at 6–7; Opposition — ECF No. 284-2 at 10–11.

United States District Court
Northern District of California

*Health Sys.*, 940 F. Supp. 2d 208, 212 (D.N.J. 2013). A settlement agreement can resolve all disputes among the parties. The settlement in *Depace* did not. *Depace* was a *qui tam* case brought under the False Claims Act; the case settled with a settlement agreement that provided for a payment to the relator and statutory fees for his counsel. *Id.* at 210. The relator and his attorney had a contingency-fee agreement that provided for a 40-percent payment to the attorney in addition to the attorney's fees paid in the settlement. *Id.* The court held that the settlement agreement did not supersede the contingency-fee agreement because the contingency fee was a contract obligation between the relator and his lawyer, while the settlement agreement defined the losing defendant's obligations to the attorney. *Id.* at 213–214.

Here, and unlike *Depace*, the settlement agreement has an integration clause that says that the agreement is the parties' entire agreement and supersedes all prior agreements about the subject matter of the litigation. The only prior agreements are the fee agreements. The court recognizes the tension in this conclusion: the settlement agreement resolves a litigated dispute, and it is not unreasonable to argue that its context matters. But on its face, arguably the settlement agreement resolves all disputes.

Even if the settlement agreement's integration clause does not foreclose Mr. Friedman's claim for additional fees, the plaintiffs are responsible in their fee agreements for Mr. Friedman's lodestar only "[i]f, in settlement of this litigation, [they] waived the right to recover attorneys' fees, costs or expenses without the consent of Attorneys . . . ."[100] There is no waiver of fees when all parties and counsel to a settlement agreement agree in it that the fee award is the reasonable statutory fee.

The court reached the same conclusion in its earlier order holding that Mr. Friedman received his reasonable fees under the settlement agreement and thus could not obtain more from Kaiser:

> This case does not involve a fee waiver. Instead, the settlement agreement explicitly provided for the payment of substantial attorney's fees in a case that did not resolve as a class action and that resulted in a favorable merits settlement to the

---

[99] Reply — ECF No. 316-2 at 10–11 (citing *United States ex rel. Depace v. Cooper Health Sys.*, 940 F. Supp. 2d 208, 212 (D.N.J. 2013).

[100] Retainer Agreements — ECF Nos. 265-4 at 3, 7, 11, and 15.

United States District Court
Northern District of California

individual plaintiffs. The total award to the six plaintiffs was $███████, and an additional $███████ was allocated to fees and costs as follows: Jeremy L. Friedman – $███████; Gordon W. Renneisen – $███████; Kendra L. Tanacea – $120,000; and costs – $███████. (Settlement Agreement, ¶ 2(a)-(g).) Mr. Friedman obtained another $███████ in fees from Ms. Hill, bringing his total to $███████. (*See* BASF Non-Binding Arbitration Award, ECF No. 182-7 at 2, 5.) At the time of the BASF arbitration, Mr. Friedman claimed only that his services were worth $931,800, and he had withheld $███████ (the amount at stake there). (*See id.*) The fees are Mr. Friedman's reasonable statutory fees that presumably are supported by a lodestar cross check. *See Lealao v. Beneficial California, Inc.*, 82 Cal. App. 4th 19, 26 (2000) ("The lodestar . . . is produced by multiplying the number of hours reasonably expended by counsel by a reasonable hourly rate."). After all, the persons who signed the settlement agreement (including Mr. Friedman and the other two plaintiffs' counsel) agreed that the fees were reasonable, statutory fees. (Settlement Agreement ¶ 5; *see supra* Statement.)

Finally, as the Court said in *Jeff D.*,

Each negotiation, like each litigant, is unique; reasonableness can only be determined by looking at the strength of the plaintiff's case, the stage at which the settlement is effective, the substantiality of the relief obtained on the merits, and the explanations of the parties as to why they did what they did. . . . The key in these situations is whether the defendant's offer is reasonable in light of all the circumstances, including the chances of success on the merits and the risk of possible exposure in damages and attorney['s] fees. And in making such determinations, the legitimate interest of the fee shifting provisions must be balanced against the legitimate interest of the defendant, whether a governmental agency or private party, in making an offer which will fix liability with considerable certainty. This balancing approach applies regardless of whether the issue is phrased in terms of the right of the defendant to make a lump sum settlement offer, or the right to refuse to pay fees to the plaintiff's attorney while providing some measure of relief to the client. In both situations, the inquiry is the same and can be decided only on a case by case basis, assessing the reasonableness of the defendant's conduct.

*Id.* at 742 n. 35 (quotations and citations omitted). Considering the strength of the plaintiffs' claims, the extent of the merits relief, the stage of the litigation, the fees that were compromised, and the explanations of the parties supporting the settlement agreement, the settlement agreement is more than acceptable under *Jeff D.*'s *quid pro quo* standard. *See id.* at 741.[101]

In sum, the settlement agreement is an integrated agreement, it awarded reasonable statutory fees, and there was no waiver of fees that triggers an obligation under section 6 of the fee agreements.

Even if the settlement agreement did not foreclose Mr. Friedman's claim for additional fees, Mr. Friedman is not entitled to more, either by contract or quasi contract.

---

[101] 9/1/2015 Order — ECF No. 236 at 17–18.

ORDER (No. 10-cv-02833-LB)                    20

### 2.   The Plaintiffs Voided the Fee Agreements

Mr. Friedman seeks his lodestar fees by contract (under the fee agreements) or — if the fee agreements are voidable by the clients — quasi contract under California Business and Professions Code § 6147.

The fee agreements are contingency-fee contracts; that context triggers certain obligations under California law. Among other things, the California Business & Professions Code required Mr. Friedman to (1) "at the time the contract is entered into" (2) "provide a duplicate copy of the contract, signed by both the attorney and the client, . . . to the plaintiff[s] . . . ." Cal. Bus. & Prof. Code § 6147(a). "Failure to comply with any provision of this section renders the agreement voidable at the option of the plaintiff, and the attorney shall thereupon be entitled to collect a reasonable fee." *Id.* § 6147(b).

The plaintiffs declared that they never received a signed copy and voided the contracts.[102] Mr. Friedman declared that the plaintiffs signed the contracts at the EEOC before their intake interview; he did not believe he had to sign his own copies.[103] It would have been his practice to sign the agreements or "otherwise transmit them by electronic communication and/or contain [his] electronic signature or letterhead sufficient to demonstrate [his] agreement."[104] He criticized the plaintiffs' failure to produce their copies.[105] But Mr. Friedman did not produce his own email records or fax confirmations. And he relies on memory about his practices nine years ago. By contrast, the plaintiffs declare under penalty of perjury that they never received duplicate signed copies, and thus they cannot produce them.

On this record, the court concludes that the retainer agreements are voidable by the plaintiffs. *See* Cal. Bus. & Prof. Code § 6147(b); *Alderman v. Hamilton*, 205 Cal. App. 3d 1033, 1038 (1988) (client has absolute right to void contract when attorney does not comply with section 6147).

---

[102] Clients' Decls. — ECF No. 284-3 at 5, 7, 10, and 16.

[103] Friedman Supp. Decl. — ECF No. 324-5, ¶ 4.

[104] *Id.*

[105] *Id.*

United States District Court
Northern District of California

Even so, and as Mr. Friedman asserts, he is entitled under Business and Professions Code § 6147(b) to collect a reasonable fee from the four plaintiffs who had fee agreements and from Ms. Mike on a *quantum meruit* theory. (This of course assumes that the payment of reasonable statutory fees in the settlement agreement does not end the inquiry.) The next section addresses whether Mr. Friedman's claimed fee of $1,092,575 is reasonable under a lodestar analysis.

### 3.   Lodestar Analysis

The federal and state statutes authorize fees for the claims in the complaint. Mr. Friedman also claims fees by contract (the fee agreements) or quasi contract (Cal. Bus. & Prof. Code § 6147(b) or *quantum meruit*). The analysis of a reasonable fee award under these theories begins with the lodestar, which the court calculates by multiplying the number of hours reasonably spent by counsel by a reasonable hourly rate. *Hensley v. Eckhart*, 461 U.S. 424, 433 (1983); *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996); *Lealao v. Beneficial Cal., Inc*., 82 Cal. App. 4th 19, 26 (2000).

When federal statutes authorize attorney's fees, courts apply a two-step process to calculate the fee award. *See Fischer v. SJB-P.D., Inc.*, 214 F.3d 1115, 1119 (9th Cir. 2000).

First, the court calculates the presumptive lodestar award. *Grove v. Wells Fargo Fin. Cal., Inc.*, 606 F.3d 577, 582 (9th Cir. 2010).

Second, "in appropriate cases, the district court may adjust the 'presumptively reasonable' lodestar figure based upon the factors listed in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69–70 (9th Cir. 1975) . . . that have not been subsumed in the lodestar calculation." *Intel Corp. v. Terabyte Int'l, Inc.*, 6 F.3d 614, 622 (9th Cir. 1993). The *Kerr* factors are: "(1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the 'undesirability' of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in

similar cases." *Kerr*, 526 F.2d at 70. "The lodestar amount presumably reflects the novelty and complexity of the issues, the special skill and experience of counsel, the quality of representation, and the results obtained from the litigation." *Intel Corp.*, 6 F.3d at 622; *see also Perdue v. Kenny A.*, 559 U.S. 542, 553 (2010) (noting that the lodestar figure includes "most, if not all, of the relevant factors constituting a 'reasonable' attorney's fee"). Thus, in appropriate cases, the court may examine the remaining factors to determine whether an enhancement or a decrease in the lodestar figure is warranted. *Clark v. City of Los Angeles*, 803 F.2d 987, 991 (9th Cir. 1986). Nonetheless, there is a strong presumption that the lodestar figure represents a reasonable fee and any upward or downward adjustment of that figure is proper only in "rare and exceptional cases." *Van Gerwen v. Guar. Mut. Life Co.*, 214 F.3d 1041, 1045 (9th Cir. 2000) (internal quotations omitted).

Under California law, the court also begins with the lodestar: the number of hours reasonably expended multiplied by the reasonable hourly rate. *Chavez v. City of Los Angeles*, 47 Cal. 4th 970, 985 (2010); *Ctr. for Biological Diversity v. Cnty. of San Bernardino*, 185 Cal. App. 4th 866, 895–96 (2010). "[T]he lodestar is the basic fee for comparable legal services in the community," and the court may adjust it based on several factors. *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001) (citing *Serrano v. Priest*, 20 Cal. 3d 25, 49 (1977)). "The purpose of such adjustment is to fix a fee at the fair market value for the particular action. In effect, the court determines, retrospectively, whether the litigation involved a contingent risk or required extraordinary legal skill justifying augmentation of the unadorned lodestar in order to approximate the fair market value for such services." *Id.* (citing *Serrano*, 20 Cal. 3d at 49). To determine whether a multiplier should be applied, the court considers the following factors: (1) the novelty or difficulty of the questions involved; (2) the expertise and capability of counsel; (3) the results obtained; (4) the contingent risk involved in the case; (5) the extent to which the nature of the litigation precluded other employment by the attorneys; and (6) whether the attorneys received public and/or charitable funding. *Serrano*, 20 Cal. 3d at 48–49. Unlike federal law, California law authorizes the court to apply a multiplier to the lodestar figure to adjust for contingency risk. *Id.*

1        This is a FEHA case, and Mr. Friedman asserts that the special concerns that attend a court's

2    award of attorney's fees under the FEHA statute are relevant to the court's determination of a

3    reasonable fee award here. Under FEHA, "the court, in its discretion, may award to the prevailing

4    party . . . reasonable attorney's fees and costs." Cal. Gov't Code § 12965(b). Generally, "[a]bsent

5    circumstances rendering the award unjust, an attorney fee award should ordinarily include

6    compensation for *all* the hours *reasonably spent* in litigating the action to a successful

7    conclusion." *Horsford v. Bd. of Trustees of Cal. State Univ.*, 132 Cal. App. 4th 359, 394 (2005)

8    (emphasis in the original) (internal quotations omitted). The California Supreme Court has held

9    that to accomplish the legislative purpose of "assuring the availability of counsel to bring

10   meritorious actions under FEHA, the goal of an award of attorneys fees is to fix a fee at the fair

11   market value for the particular action." *Id.* (citing *Ketchum*, 24 Cal. 4th at 1132) (internal

12   quotations omitted). A court should exercise its discretion under California Government Code

13   § 12965(b) in a matter that, in the court's judgment, will best effectuate the purpose of FEHA. *Id.*

14   The underlying purpose of FEHA "is to safeguard the rights of Californians to seek, obtain, and

15   hold employment without experiencing discrimination." *Flannery v. Prentice*, 26 Cal. 4th 572,

16   582–83 (2001).

17       To this legal context, the court adds the following. This is a settled case with substantial fees. It

18   is not the ordinary fees conflict where a prevailing plaintiff seeks fees and a losing defendant —

19   with deep knowledge of the litigation and the effort actually and appropriately expended on it —

20   opposes the fees as unreasonable. Instead, the plaintiffs themselves — who largely did not

21   participate personally in the case except during conferences with their attorney, somewhat in

22   discovery, and partly in settlement — are put to the task of challenging fees (albeit with the

23   assistance of new *pro bono* counsel). In this case, the litigation timeline gives context to the

24   parties' submissions and reveals important information about the parties' efforts during litigation,

25   the utility of them, and whether the hours spent were reasonable. The fee agreements are relevant

26   too; even if they are voidable, they show the parties' expectations and define what Mr. Friedman

27   can rightly demand of his client. Similarly, the total fee award in the settlement agreement is

28   relevant not only because the parties and counsel conceded that it was a reasonable statutory fee,

but also because the plaintiffs' obligation under section 6 of the fee agreements is to "Attorneys." These considerations are relevant to the evaluation of whether Mr. Friedman's hours were reasonably spent and whether his claimed hourly rate of $725 is reasonable.

### 3.1  Number of Hours

The first issue is whether Mr. Friedman's 1,507 hours were reasonably spent in the litigation.

Ordinarily, a prevailing party has the initial burden of establishing the hours expended litigating the case and must provide detailed time records documenting the tasks completed and the amount of time spent. *Hensley*, 461 U.S. at 437; *Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 945–46 (9th Cir. 2007). The applicant must exercise sound "billing judgment" regarding the number of hours worked, eliminate excessive, redundant, unproductive, or unnecessary hours, and provide the district court with billing records supporting the time claimed. *Hensley*, 461 U.S. at 434, 437. The applicant is "not required to record in great detail how each minute of his time was expended," but should "identify the general subject matter of his time expenditures." *Id.* at 437 n.12. "Where the documentation of hours is inadequate, the district court may reduce the award accordingly." *Id.* at 433; *see Fischer*, 214 F.3d at 1121 ("[P]laintiff's counsel can meet his burden — although just barely — by simply listing his hours and 'identify[ing] the general subject matter of his time expenditures.'") (second alteration in original). The district court may exclude any hours that are excessive, redundant, or otherwise unnecessary. *Hensley*, 461 U.S. at 434.

After the party seeking fees has come forward with its evidence supporting the time billed, "[t]he party opposing the fee application has a burden of rebuttal that requires submission of evidence to the district court challenging the accuracy and reasonableness of the hours charged or the facts asserted by the prevailing party in its submitted affidavits." *Gates v. Deukmejian*, 987 F.2d 1392, 1397–98 (9th Cir. 1992). The party opposing fees must identify defects or deficiencies in the hours requested; conclusory and unsubstantiated objections are insufficient to warrant a reduction in fees. *Cancio v. Fin. Credit Network, Inc.*, No. C04-3755 TEH, 2005 WL 1629809, at *3 (N.D. Cal. July 6, 2005).

1      Even if the opposing party has not objected to the time billed, the district court "may not

2  uncritically accept a fee request," but must review the time billed and assess whether it is

3  reasonable in light of the work performed and the context of the case. *Common Cause v. Jones*,

4  235 F. Supp. 2d 1076, 1079 (C.D. Cal. 2002) (citing *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d

5  1378, 1385 (9th Cir. 1984)); *see also McGrath v. Cnty. of Nevada*, 67 F.3d 248, 254 n.5 (9th Cir.

6  1995) (court may not adopt prevailing party's representations without conducting an independent

7  review of the fee application). In fulfilling this responsibility, district courts have broad discretion

8  to reduce the number of billable hours awarded. Courts have reduced fee awards where counsel

9  engaged in inefficient or unreasonably duplicative billing, or where counsel's billing records

10  contain insufficiently descriptive entries, show evidence of block billing, or show billing in large

11  time increments. *See, e.g.*, *Welch*, 480 F.3d at 948–49.

12      Mr. Friedman puts forth 1,507 hours as reasonable hours, noting that he underestimated his

13  time by 10 to 20 percent, possibly more:

14          54. These time records conservatively understate the amount of time that was
       actually expended in this litigation. Each entry, when made, is for less time than
15       was actually expended, based upon appropriate billing judgment that is not
       reflected in the records. Moreover, over the course of six years, much unrecorded
16       time was expended analyzing the issues to be resolved, in discussion with
       colleagues knowledgeable about employment discrimination actions in general or
17       Kaiser in particular, and brief telephone conversations with clients, witnesses and
       co-counsel. While serving as lead counsel on this complex civil rights litigation,
18       much productive work was accomplished under circumstances that did not permit
       efficient recording. By my reasonable estimation, these time records understate
19       total time expended between 10 and 20 percent, possibly more.[106]

20

21      The following examples demonstrate duplicative work and the lack of an exercise of billing

22  judgment: (1) duplicative work starting in March 2011 through November 2012 (especially work

23  on class claims and the discovery motion); (2) duplicative and excessive hours on settlement from

24  December 2012 to July 2013; and (3) unnecessary work on settlement from July 2013 to

25  December 2013.

26

27

28  [106] Friedman Decl. — ECF No. 278-4, ¶ 54.

*United States District Court*
*Northern District of California*

### 3.1.1   Work from March 2011 to November 2012

The docket shows the following work in the case from the filing of the complaint in 2010 until the stay in November 2012: (1) the complaint and the initial motion to dismiss (individual claims only); (2) motions practice relating to the class claims; (3) the depositions of the five living plaintiffs; (4) initial disclosures and discovery responses by the plaintiffs; (5) Rule 30(b)(6) notice and depositions; and (5) the discovery motion to compel further class and pattern-and-practice discovery.[107]

The litigation surrounding the class claims is summarized in the Statement, *supra*.[108]

The case-management statements in February 2012, July 2012, and October 2012 report the parties' discovery and progress: (1) document requests and initial disclosures in February 2012 and a bifurcated discovery plan geared toward class certification; (2) a Kaiser production of 5,500 pages by July and deposition of two named plaintiffs; and (3) a Kaiser production of 12,000 pages by October, depositions of the remaining plaintiffs, a Rule 30(b)(6) deposition notice, potential depositions by the plaintiffs of Kaiser's witnesses, and the plaintiffs' representation that they had not received the foundational statistical-data discovery for their class claims, had a pending motion to resolve the dispute, and could not prepare or produce the expert reports.[109]

In November, the discovery judge resolved the discovery motion largely in Kaiser's favor, ordering the following: (1) Kaiser had produced Affirmative Action Plans that redacted data about females, and the court ordered Kaiser to produce the plans without redacting data about females; (2) the court denied the plaintiffs' request to produce discovery back to 2000 but also overruled Kaiser's objection to extending the discovery before 2006 and extended discovery back to 2004; (3) the court ordered the parties to confer on the plaintiffs' requests for production, which were "overbroad but Plaintiffs are entitled to a little bit more discovery" not just on the jobs they held or applied to but also on jobs that would be "reasonably likely to be part of a relevant career path";

---

[107] *See* ECF Nos. 1, 14, 32, 35, 42, 53, 56, 67, 70, 75, 81, 103, 123, 128, and 129.

[108] *See* Statement Section 2, Timeline Through Settlement.

[109] ECF Nos. 75, 81, and 103.

United States District Court
Northern District of California

(4) the court ordered the parties to confer on whether Kaiser's production of EEO complaints was slightly too narrow; (5) the court ordered the parties to confer on whether the ESI TIFF version of EEO-1 reports might be feasibly produced in a data form that could be manipulated; (6) the court denied the plaintiffs' motion to compel information regarding other job groups; and (7) the court denied without prejudice the plaintiffs' motion to compel production of information about non African-American minorities; the plaintiffs could revisit the issue by filing a brief with supporting authority and an expert declaration.[110]

The record reveals the three attorneys' division of labor. Mr. Renneisen and Ms. Tanacea associated into the case in March 2011.[111] Mr. Friedman explains that after the district judge issued his first decision on the first motion to dismiss, he had to decide whether and how the plaintiffs could proceed on their pattern and practice claims:

> While the stage had been set for class claims, as a sole practitioner — with another federal trial set to begin later that year in Lost Angeles — I would have been unable to plead class claims and take on responsibility for putative class counsel alone. The alternative was to try plaintiffs' individual claims without the *Teamsters* presumption, and preserve the legal issues around shifting burdens of proof for a later appeal. In this case, because of the unique opportunity to associate Renneisen and Tanacea into the case, each with their own skills and experience, we were able to plead the class claims.[112]

Mr. Renneisen was primarily responsible for the litigation, and Ms. Tanacea was responsible for discovery, document review and analysis, working up damages, and a motion to compel.[113] According to Mr. Friedman, Mr. Renneisen was co-lead counsel and assisted with the first and second amended complaints and in taking the lead in responding to Kaiser's motion to dismiss, successfully analyzing and briefing cutting-edge issues raised in *Wal-Mart v. Dukes*.[114] Mr.

---

[110] 11/6/2012 Minute Order — ECF No. 123; ECF Nos. 128 and 129 (proposed order and objections); 11/16/2012 Order — ECF No. 130.

[111] Friedman Decl. — ECF No. 278-4, ¶ 25; Association of Counsel — ECF No. 34; Tanacea Decl. — ECF No. 284-4, ¶ 2. Mr. Friedman represented the plaintiffs from June 2007 through the EEOC investigation. The court does not discount hours before March 2011.

[112] Friedman Decl. — ECF No. 182-11, ¶ 20.

[113] Tanacea Decl. — ECF No. 284-4, ¶ 2.

[114] Friedman Decl. — ECF No. 193-5 at 10, ¶ 22(a).

Renneisen "was able to take over case management responsibilities — including day-to-day communications with opposing counsel, opposing motion pleadings[,] and oversight of discovery production. This was necessary due to my conflicting trial schedules, when I was unable to work extensively on the case."[115]

Again according to Mr. Friedman, Mr. Renneisen defended the Mike deposition, prepared for the other depositions, took the lead on the discovery plan for the Rule 30(b)(6) deposition, and deposed three Rule 30(b)(6) witnesses.[116] "As in any complex class action, case management . . . required particular skills and expertise;" Mr. Renneisen negotiated with Kaiser over case-management documents, scheduling, a protective order, and case-management statements, and he wrote, argued, and won a Rule 16 motion.[117] Ms. Tanacea took "primary responsibility for preparing the discovery responses, reviewing the 20,000 pages of documents, and handling many other tasks relat[ed] to written discovery."[118]

Mr. Friedman did not depose witnesses except for defending Ms. Harrison's deposition in Florida.[119]

In sum, the record reflects the following allocation of responsibilities: (1) Mr. Renneisen came in to plead and then prosecute the class claims because Mr. Friedman was unable to do it, and the alternative was to try the individual claims without the *Teamsters* presumption and preserve the legal issues around burden of proof for a later appeal; (2) Mr. Renneisen assumed primary responsibility for litigation work, including pleading the class claims, responding to the motion to dismiss the class claims, case management, and handling the Rule 30(b)(6) depositions; and (3) Ms. Tanacea handled discovery, including preparing the discovery responses, reviewing documents, preparing indexes, and otherwise working on tasks related to written discovery.[120] Mr.

---

[115] Friedman Decl. — ECF No. 182-11, ¶ 30.

[116] Friedman Decl. — ECF No. 193-5 at 10, ¶ 22(b).

[117] *Id.* ¶ 22(c).

[118] *Id.* at 9, ¶ 24.

[119] Tanacea Decl. — ECF No. 284-4, ¶ 2

[120] Friedman Decl. — ECF No. 278-4, ¶¶ 25, 31; Friedman Decl. — ECF No. 182-11, ¶ 20; Friedman Decl. — ECF No. 193-5 at 9, ¶ 24, & 10, ¶ 22(a)–(c); Tanacea Decl. — ECF No. 284-4,

Friedman had the client relationship and was the primary person who engaged with them,[121] and he oversaw the litigation as the initiator of this lawsuit and other lawsuits against Kaiser.

The billing records confirm this allocation of work.

In 2011, Mr. Renneisen spent approximately 159.1 hours on the following tasks: revising the first amended complaint (6.5 hours); evaluating the motion to dismiss (9.3 hours); working with Mr. Friedman on the second amended complaint (8.3 hours); drafting the opposition to the motion to dismiss and handling related work (69.8 hours); working with Ms. Tanacea on discovery (25.6 hours); case analysis and strategy (3.8 hours); and case management (such as preparing stipulations and case-management statements) (35.8 hours).[122] In 2011, Ms. Tanacea spent approximately 76.4 hours on the following tasks: interviewing all clients, drafting fact memos, and drafting responses to all discovery requests in March through May (50 hours); research, correspondence to the EEOC and review of documents and correspondence, and finalizing the initial disclosures in May through July (10 hours); reviewing Kaiser's document production in September (8.6 hours); a team call in October (.8 hours); and correspondence, calls, and drafting parts of the opposition to the motions to dismiss in November (7 hours).[123]

Through November 2012, Mr. Renneisen spent approximately 605.4 hours on the following tasks, among others: case management in January and February (25.7 hours); discovery review and case strategy and analysis in March and April (6.2 hours); meetings with Kaiser on discovery, discovery review, case management, analysis, and strategy in May (32.8 hours); prepping for depositions, working on discovery, and case analysis and strategy in June 2012 (52.1 hours); document review, case management, and analysis and strategy in July (14.9 hours); discovery, discovery motions, depositions, and strategy in August (90.7 hours); discovery motions, work on the Rule 30(b)(6) deposition, and strategy in September (75.1 hours); and discovery motions,

¶ 2.

[121] Hill Decl. — ECF No. 324-3, ¶ 2 ("Even after he was joined by [co-counsel], Mr. Friedman continued to take the lead in every meeting, conference[,] or group telephone call we had.")

[122] ECF No. 182-11 at 25–26.

[123] *Id.* at 36.

discovery review, depositions, and settlement work (including the stay) with Ms. Abell (representing Kaiser) in November (98.8 hours).[124] Through November 2012, Ms. Tanacea spent approximately 106.9 hours on the following tasks: editing the CMC statement in January (.6 hours); legal research and drafting the motion to compel in September (18.3 hours); document review and index, preparing PMK questions, drafting the reply declaration for the motion to compel, summarizing and indexing Kaiser's third production, and drafting Jennings's discovery responses in October (52 hours); and working on the motion to compel, revising the responses to the special interrogatories, working on Hill's demand, drafting the PMK notice, and conferences with the statistical expert in November (36 hours).[125]

Mr. Friedman's records show strategy and oversight and review of his co-counsel's work. This is a high-level summary of his billing records through 2012[126] and his explanations about them.[127]

| Year | Total Hours | Summary of Significant Tasks | Friedman Explanation |
|------|-------------|------------------------------|----------------------|
| 2007 | 60.5 | Phone calls, meetings, and communications with clients re class and discrimination claims and EEOC filings; working on and filing EEOC charges. | Prior litigation against Kaiser meant that Mr. Friedman had extensive knowledge of it, which led to fewer hours. Otherwise might have spent close to 200 hours.[128] |
| 2008 | 36.9 | Phone calls, meetings, and communications with clients/EEOC. | Same. A firm might spend 100-200 hours for 2.5-yr. EEOC process.[129] |
| 2009 | 22.8 | Same. | Same. |
| 2010 | 89.1 | Same until June; draft and file complaint after EEOC declined to prosecute; litigation including motion to dismiss. | A firm would have spent over 100 hours drafting a complaint; spent fewer than 40 hours in June. Nixon Peabody was aggressive.[130] |
| 2011 | 238.9 | Jan: 39.20 (opposition to motion) Feb: 13.7 (clients, CMC, discovery) Mar: 66.5 (discovery, complaint) | Complaint and motion to dismiss were done efficiently.[131] |

[124] *Id.* at 26–32.

[125] *Id.* at 37.

[126] The records are in Exhibit 7, ECF No. 265-12 (hereinafter "Friedman Billing Records").

[127] Friedman Decl. — ECF No. 278-4, ¶¶ 52–56.

[128] Friedman Decl. — ECF No. 182-11, ¶ 16.

[129] *Id.* ¶ 17.

[130] *Id.* ¶¶ 18, 19.

[131] Friedman Decl. — ECF No. 278-4, ¶¶ 29–30.

United States District Court
Northern District of California

| | | April: 22 (confer, discovery, clients)<br>May: 24.9 (same, motion to dismiss)<br>June: 2 (confer Abell and GWR)<br>July: 12 (confer, discovery, complaint)<br>Aug: 1.8 (same)<br>Sept: 10.3 (same)<br>Oct: 14.5 (same + motion to dismiss)<br>Nov: 16.8 (same)<br>Dec: 15.2 (communications, writ) | |
|---|---|---|---|
| 2012 | 501.1 | Jan: 11.2 (same)<br>Feb: 9.8 (confer, CMC, discovery)<br>Mar: .3 (case status)<br>April: 2.3 (discovery)<br>May: 13.6 (same + depo scheduling)<br>June: 23.1 (same esp. re data)<br>July: 38.2 (same + CMC statement)<br>Aug: 33.4 (same)<br>Sept: 80.6 (same, motion to compel)<br>Oct: 136.9 (discovery, Tampa, expert)<br>Nov: 59.5 (discovery, motions)<br>Dec: 92.2 (data and settlement) | Worked September through December on discovery and data analysis for class allegations and discrimination claims. Tampa depo required travel and prep. After the discovery hearing in November, Kaiser was interested in settlement negotiations. Mr. Friedman then had to confer with counsel and the expert to evaluate the data and the strength of the evidence to date. A firm would have billed over 1000 hours on data and discovery.[132] |

Mr. Friedman says that he exercised billing judgment by not recording all of his time; his billing records for this time period show only one write off on March 27, 2011, where he limited his time to 13 hours drafting the initial complaint.[133] By contrast, Mr. Renneisen's billing records reflect that he wrote off duplicate hours; for example, he wrote off the time he sat in on a deposition defended by someone else.[134] Mr. Renneisen's records are specific about when he worked with co-counsel.[135] He did not bill for time "getting up to speed" on the case and did not begin billing until he was doing substantive work on the pleadings.[136]

More fundamentally, the records here show that Mr. Friedman billed for work (and review and oversight of work) that other lawyers took primary responsibility for. Partners often need to review associate work or the work of less experienced lawyers more granularly. But the billing

---

[132] *Id.* ¶¶ 32 –34; Friedman Decl. — ECF No. 182-11, ¶¶ 21–23.

[133] Friedman Billing Records — ECF No. 265-12 at 17. On January 6, 2011, he cut off research at 14 hours. *Id.* at 15.

[134] ECF No. 182-11 at 28.

[135] *See, e.g.*, *id.* at 25, 28, and 30.

[136] Friedman Decl. — ECF No. 193-5 at 10, ¶ 22(a).

United States District Court<br>Northern District of California

records show that Mr. Friedman recorded primarily partner-level review and strategy hours for other partner-level people: Mr. Renneisen (a former Heller, Ehrman partner who worked on the class claims and assumed primary responsibility for class claims, and related motions, discovery, and case management) and Ms. Tanacea (also accomplished, and with 20 years' experience, who worked on discovery and discovery litigation). Mr. Friedman specified that he hired them for their expertise doing work (especially with Mr. Renneisen in the class context) that he was not equipped to do, either by background or because of his trial conflicts.[137] Looking at the overall hours for the three lawyers from March 2011 to November 2012, the primary issue is that — with three "partners" on the case and the division of responsibilities — the overall hours claimed are duplicative and unnecessary. One might expect to see some write off of hours for duplicate work by Mr. Friedman. The records do not show any. This review by partners of partners at partner rates does not accord with ordinary views about the exercise of billing judgment. And it does not seem reasonable to saddle the plaintiffs with that overall fee exposure.

To the extent that Mr. Friedman relies on his facility with data analysis,[138] the discovery litigation was about getting the data to perform the analysis.[139] From the case-management timeline, information had not been produced in February, looked to be in process by July, and was addressed in the parties' discovery litigation in the September to November period.[140] In October, the plaintiffs complained that they had not received the basic foundational discovery for their class claims in the form of statistical data and thus could not prepare or produce expert reports (and needed their discovery motion to be resolved to do so).[141] The discovery judge resolved that motion only in November.[142] The court appreciates that that the lawyers reviewed discovery as it was produced. But by the plaintiffs' own account, and looking particularly at Mr. Friedman's and

---

[137] *See* Friedman Decl. — ECF No. 182-11, ¶¶ 30–31.

[138] *See* Motion for Attorney's Fees — ECF No. 278-2 at 7.

[139] Friedman Decl. — ECF No. 278-4, ¶ 32.

[140] ECF Nos. 75 at 9–10, 81 at 5–6, 103 at 5–11, 123, and 128 through 130.

[141] ECF No. 103 at 5–11.

[142] 11/1/2012 Order — ECF No. 130.

Ms. Tanacea's billing records for part of November and December 2012, that is when the bulk of the analysis took place. Mr. Friedman says as much:

> 34. After the discovery hearing with Judge Laporte [in November 2012], Kaiser communicated an interest in settlement discussions. At that point, I was required to expend considerable time in conference with my co-counsel and our expert statistician, evaluating the data and determining the strength of the evidence obtained to date.[143]

A related issue is the interplay with attorney hours and the class claims. The class claims were not settled and were dismissed voluntarily without prejudice. Instead, the parties resolved only the individual claims. Under *Dukes*, certifying class claims of discrimination was ambitious; the court's view is that it was unlikely. Because the case settled, perhaps evaluating the issue is too hypothetical to be useful. But it seems tricky: the plaintiffs worked in one department in similar positions, and the purported class worked in many departments and many positions with different supervisors.[144] Time spent on unsuccessful claims may be excluded from the lodestar. *The Trad'l Cat Ass'n, Inc. v. Gilbreath*, 340 F.3d 829, 832–34 (9th Cir. 2003).

On the other hand, arguably the class claims (and the statistical data) supported the outcomes for the plaintiffs. *Cf. T.B. ex rel. Brenneise v. San Diego Unified Sch. Dist.*, 806 F.3d 451, 486 (9th Cir. 2015). Mr. Friedman said that ████████████████████████████████████ ████████████████████████████████████.[145] But he also said that the settlement was "extremely attractive" given the "infirmities of the individual claims . . . [which] included various admissions and concessions made by plaintiffs to Kaiser during discovery."[146] Assuming that the plaintiffs satisfied their prima facie burden under the *McDonnell Douglas* test, the plaintiffs' concessions may have made it difficult to show that Kaiser's stated justification was pretextual.

---

[143] Friedman Decl. — ECF No. 278-4, ¶ 34.

[144] SAC ¶¶ 7–12, 17, 24 31.

[145] Motion for Attorney's Fees — ECF No. 278-2 at 7.

[146] Friedman Decl. — ECF No. 278-4, ¶ 43.

United States District Court
Northern District of California

For these reasons, the court reduces hours from March 2011 to November 2012 by 15 percent. *See Moreno v. City of Sacramento*, 534 F.3d 1106, 1112 (9th Cir. 2008). This is a conservative approach. The result is as follows: (1) total hours March 2011 through November 2012: 594.9; and (2) 15 percent of 594.9 yields 89.2 hours subtracted from the lodestar hours.

### 3.1.2   Hours From December 2012 through July 2013

The hours after November 2012 are more problematic. By November 20, 2012, the parties negotiated a stay of discovery to pursue settlement negotiations. From December 2012 to July 2013, Mr. Friedman accounts for 494.2 hours working on settlement.[147]

Those hours must be considered in light of Mr. Renneisen's hours: 93.4 hours working on settlement with Ms. Abell in December and another 242.2 hours in 2013 for a total of 335.6 hours.[148] According to Ms. Tanacea, "Mr. Renneisen was solely responsible for opening settlement discussions and he was the person responsible for negotiating the prospective relief" (meaning, the programmatic changes) before the parties discussed the monetary settlement.[149] Ms. Abell confirms that "[d]uring the settlement negotiations in this matter that took place from November 2012 to December 2013, Mr. Renneisen was the primary contact on behalf of Plaintiffs, and I never spoke to Mr. Friedman about settlement during these negotiations either in person or on the telephone without at least one of his co-counsel being present or participating."[150]

Mr. Friedman relies on his acumen regarding the data analysis.[151] After the parties obtained the data sets in discovery, the plaintiffs retained a statistical expert to analyze it.[152] That work is reflected in Mr. Friedman's hours in December 2012;[153] Ms. Tanacea also shows work with the

---

[147] Friedman Billing Records — ECF No. 26-12 at 43–58.

[148] *See* ECF No. 182-11 at 32–34.

[149] Tanacea Decl. — ECF No. 284-4, ¶ 2.

[150] Abell Decl. — ECF No. 200-5, ¶ 3.

[151] *See* Motion for Attorney's Fees — ECF No. 278-2 at 7.

[152] Friedman Decl. — ECF No. 278-4, ¶ 38. The data analysis is in a May 2013 letter. *See* Ex. 3, ECF No. 265-7.

[153] Friedman Billing Records — ECF No. 265-12 at 43–45.

expert and data runs in December for a total of 78 hours.[154] Leaving December out still results in the following hours worked on settlement from January through July: 402 hours for Mr. Friedman, 242.2 hours for Mr. Renneisen, and 59 hours for Ms. Tanacea (primarily on damages).[155] That is duplicative and excessive, especially considering that Mr. Renneisen was the lead on settlement, perhaps because Mr. Friedman was in trial.[156]

   "Once it became apparent that the parties were headed toward settlement after the prospective relief was finalized," Mr. Renneisen and Ms. Tanacea "significantly curtailed [their] billing" and "held back on [their] billing after the second settlement conference in or around July 9, 2013."[157] On May 7, 2013, at a case meeting at Zazie restaurant, Mr. Friedman told Mr. Renneisen and Ms. Tanacea that "he intended to 'ramp up' his billing."[158] Mr. Friedman disputes that this is what he said; he said that he merely told his co-counsel he had finished his trial, was back in the case, and would assume the lead again.[159]

   The court recognizes that Mr. Friedman thinks he was integral to the negotiations. But according to Ms. Tanacea, Mr. Renneisen was responsible for opening settlement discussions.[160] Ms. Abell confirms he was the primary negotiator, and she never spoke to Mr. Friedman alone about settlement.[161] The record supports the conclusion that Mr. Friedman had the client relationship and oversight of the litigation,[162] but Mr. Renneisen drove the litigation and the settlement negotiations, especially in Mr. Friedman's absence. Many of Mr. Friedman's hours in

---

[154] *See* ECF No. 182-11 at 37.

[155] Friedman Billing Records — ECF No. 265-12 at 45–58; ECF No. 182-11 at 33–34, 37–38.

[156] On January 25, 2013, the court set a settlement conference for March; the parties stipulated on February 20 to continue it to April because Mr. Friedman would be in trial in Boston, was the original attorney for the plaintiffs, and needed to be there for the settlement conference. ECF Nos. 134 and 136.

[157] Tanacea Decl. — ECF No. 284-4, ¶ 3.

[158] *Id.* ¶ 4.

[159] Friedman Supp. Decl. — ECF No. 324-5, ¶ 3.

[160] Tanacea Decl. — ECF No. 284-4, ¶ 2.

[161] Abell Decl. — ECF No. 200-5, ¶ 3.

[162] Hill Decl. — ECF No. 324-3, ¶ 2.

United States District Court
Northern District of California

1   any event are duplicative and unnecessary. Contrasting Mr. Friedman's hours to Mr. Renneisen's

2   hours supports this conclusion. Mr. Renneisen spent roughly 143.9 hours in 2013 and 93.4 hours

3   in 2012 on negotiating programmatic relief.[163]

4          Moreover, after the parties negotiated programmatic relief, the negotiation necessarily was

5   about damages, a relatively simple inquiry that generally is resolved by reference to salary and the

6   strength of the evidence, and it was about attorney's fees. Mr. Renneisen spent roughly 83 hours in

7   June and July 2013.[164] That is reasonable. Mr. Friedman spent 205.9 hours, duplicating work.[165]

8          The court reduces the hours from 402 to 200 (thus, by 202 hours), which is slightly less time

9   than Mr. Renneisen spent. The court also reduces the December 2012 hours by 10 percent (or 9.2

10  hours) for duplicative billing. *See Moreno*, 534 F.3d at 1112. This reduction totals 211.2 hours.

11         ### 3.1.3   Hours after July 2013

12         Mr. Friedman claims 156 hours from August to December 2013 (a time period when his co-

13  counsel stopped billing).[166] Mr. Friedman signed his first fees declaration on July 27, 2013.[167] By

14  then, the parties had identified the information relevant to negotiating damages and fees. By

15  October, the remaining issues included some adjustments to Ms. Hill's calculations.[168] And during

16  this period, there were settlement conferences and some negotiations. But Mr. Friedman's billing

17  records primarily involve his conferences with Mr. Renneisen and Ms. Tanacea.[169]

18

19

20  ───────────────

    [163] ECF No. 182-11 at 32–33.

21  [164] *Id.* at 33.

22  [165] During this time period, Mr. Friedman's billing records show that he reduced his claimed hours
    for review of his fee claims by the following amounts: (1) 5/30/2013 (3 hours); (2) 6/1/2013 (2
23  hours); (3) 6/2/2013 (1.5 hours); (4) 6/3/2013 (1.5 hours); (5) 6/4/2013 (2 hours); (6) 6/5/2013 (2
    hours); (7) 6/6/2013 (2 hours); (8) 6/13/2013 (3 hours); and (9) 6/14/2013 (1 hour). ECF No. 265-
24  12 at 53-54. This totals 18 hours.

25  [166] Friedman Billing Records — ECF No. 265-12 at 58–64.

    [167] ECF No. 182-11 at 23.
26
    [168] *See* Friedman Billing Records — ECF No. 265-12 at 64.
27
    [169] During this time period, Mr. Friedman's billing records show that he reduced his claimed hours
28  for analysis of settlement issues by the following amounts: (1) 11/1/2013 (3 hours); (2) 11/2/2013
    (2 hours); and (3) 11/20/2013 (2 hours). (*Id.* at 62–63.)

United States District Court
Northern District of California

According to Ms. Tanacea, at the final settlement conference in December 2013, "Mr. Friedman appeared with a Third Amended Complaint, which was unnecessary work and fee generating given the status of settlement negotiations."[170] Mr. Friedman apparently believes it was necessary to show resolve for litigation going forward. The court does not see its utility.

On December 11, 2013, after the settlement conference, Ms. Tanacea reviewed Mr. Friedman's billing records for the first time and then wrote him a letter about what she felt was overbilling.[171] She declares that his billing "contains block billing, high hours given the task involved, billing for administrative tasks such as calendaring and scheduling, repeatedly reviewing the file and ECF notices, 'researching' and 'purchasing' a plane ticket, and many unnecessary hours billed after the prospect of settlement."[172] The billing records support these conclusions.

Based on its own review of the records, the 45 plus hours of settlement conferences, and the work done by Mr. Renneisen, the court allows 60 hours, which reduces the lodestar hours by 96 hours. This is generous; the hours overall are unnecessary.

### 3.1.4   Total reduction of lodestar hours

The total reduction is 396.4, which results in lodestar hours of 1,110.6. At Mr. Friedman's claimed hourly rate of $725, this is a lodestar award of $805,185. This lodestar confirms that the amount he received ($███ in settlement plus $███ from Ms. Hill for a total of $███) is reasonable under a lodestar analysis, even at Mr. Friedman's claimed hourly rate of $725.

### 3.2   Hourly Rate

The next issue is whether $725 is a reasonable hourly rate.

Courts generally look to the rates in effect at the time of the prevailing party's fee application. *Gates*, 987 F.2d at 1406. The reason is that in civil-rights cases involving a contingency-fee agreement, the plaintiff's counsel often faces "exceptional delay in the payment of fees." *Perdue*,

---

[170] Tanacea Decl. — ECF No. 284-4, ¶ 7.

[171] *Id.* ¶ 9 & Ex. 1.

[172] *Id.* ¶ 9.

United States District Court
Northern District of California

559 U.S. at 556. The court must determine a reasonable hourly rate based on the "experience, skill, and reputation of the attorney requesting fees." *Chalmers v. City of Los Angeles*, 796 F.2d 1205, 1210 (9th Cir. 1986). Determining a reasonable hourly rate is inherently difficult. *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). To determine the reasonable hourly rate, the court looks to "the rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation." *Chalmers*, 796 F.3d at 1210–11. The relevant community is typically the forum community. *Schwarz v. Sec'y of Health & Human Servs.*, 73 F.3d 895, 906 (9th Cir. 1995). To inform and assist the court in making this assessment, "the burden is on the fee applicant to produce satisfactory evidence — in addition to the attorney's own affidavits — that the requested rates are in line with those prevailing in the community." *Blum*, 465 U.S. at 895 n.11. An attorney's declaration about the reasonableness of the claimed rate is insufficient to meet the plaintiff's burden. *Jordan v. Multnomah Cnty.*, 815 F.2d 1258, 1263 (9th Cir. 1987). Declarations by attorneys regarding the prevailing market rate in the community may be sufficient to establish a reasonable hourly rate. *Widrig v. Apfel*, 140 F.3d 1207, 1209 (9th Cir. 1989). Courts have the discretion to reduce the hourly rate for tasks that could have been performed by less-skilled persons. *Ferland v. Conrad Credit Corp.*, 244 F.3d 1145, 1148 (9th Cir. 2001).

Mr. Friedman is an experienced lawyer: he went to Brown and then the University of Chicago Law School, where he was Order of the Coif; he clerked for a United States District Judge for two years after law school; and he has been a lawyer in California since he finished his clerkship in 1989.[173] He was at the Saperstein firm for five years at the beginning of his career, working on civil-rights cases.[174] He taught at the New College of California School of Law from 1994 to 1995, and he has focused on employment-discrimination litigation in his 29 years of practice.[175] Most of his cases involve statutes with fee-shifting provisions, and he expects that if he is successful, he will be paid his fees and costs by his opposing party, either through a court award or

---

[173] Friedman Decl. — ECF No. 278-4, ¶ 2.

[174] *Id.* ¶ 3.

[175] *Id.* ¶¶ 6–7.

settlement negotiations.[176] He "claim[s] an hourly rate of $725."[177] The latest declaration does not say directly that this was the rate he billed clients, but an earlier declaration said that he charged fee-paying clients $785.[178] In every case resulting in a court-awarded fee award, his "then-current hourly rate had been expressly approved by the court or pursuant to court order."[179] (He does not specify what those rates are.[180])  He evaluates his rates yearly to make sure they are consistent with rates of attorneys with comparable skills and experiences, and he decided to claim $785 per hour in 2013 based on the following: (1) in 2008, he settled an employment case with Magistrate Judge James, claimed his hourly rate then, and settled at and was paid at an effective rate of $750; (2) in 2010, he claimed and settled fees in a malicious-prosecution case at $750; (3) his law-school classmates' billing rates in 2010 to 2013 were over $800 per hour (and he cites 2013 rates for partners at Morrison & Forester ($865 average, $1195 high), Cooley ($820 average, $990 high), Paul Hastings ($815 average, $900 high, $750 low); (4) in 2013, Ms. Tanacea gave him declarations (attached as exhibits) showing that comparable attorneys charged, and courts awarded, $650 to $825; (5) Brad Seligman charged $825 per hour; (5) law firms did not raise rates much in 2009 to 2011 but did so in 2012 and 2013, as is shown by an April 2013 Wall Street Journal article reporting partner rates increasing by as much as 5.7 percent in Q1 2013 (averaging $879 to $882), continuing an upward trend from 2012, when associate billing rates rose 7.4%; and (6) he gained significant trial experience in 2010 to 2013, trying three cases, and decided "it was no longer reasonable to discount [his] rates substantially below those charged by his law[-]school classmates and litigation opponents."[181] He points to a declaration submitted in June 2014 that resulted in Judge Ryu's award of $725 per hour to Michael Haddad, "a 1991 law graduate, with four years less experience").[182]

---

176 *Id.* ¶¶ 8.

177 *Id.* ¶ 57.

178 *Id.* ¶ 58; Friedman Decl. — ECF No. 182-11, ¶ 40.

179 Friedman Decl. — ECF No. 278-4, ¶ 58.

180 *See id.*

181 *Id.* ¶ 59.

182 *Id.* ¶ 60.

United States District Court
Northern District of California

1    Considering the fee agreements and the total fee award to the three attorneys, the court

2    concludes that under the particular circumstances here, Mr. Friedman's asserted hourly rate of

3    $725 is not a reasonable hourly rate.

4    First, reasonableness must be viewed in the context of the contract, which defines the parties'

5    expectations of each other. The hourly rate in the plaintiffs' fee agreements was $450; section 6

6    warns that the rate will increase in the future.[183] But between 2007 and spring 2013, Mr. Friedman

7    did not tell his clients that he was increasing his hourly rates.[184] "[W]hen a law firm quotes

8    specific hourly rates for the services of named attorneys to a prospective client who then agrees in

9    writing to pay the firm's 'regular hourly rates,' the law firm cannot raise the rates charged by the

10   named attorneys without first notifying the client." *Severson & Werson v. Bollinger*, 235 Cal. App.

11   3d 1569, 1571 (1991).

12   Moreover, the $275 increase from $450 to $725 is a 61% increase in the hourly rate. The fee

13   agreements said that the hourly rate would increase, but nothing in the record supports a

14   conclusion that the plaintiffs reasonably would understand their exposure. A defense attorney

15   knows that the lodestar is calculated at the rate at the time of the award and has insight into what

16   those rates are; a client does not. It is why a plaintiff's attorney has the professional responsibility

17   to make sure the client understands the billing rates and procedures. *See Severson*, 235 Cal. App.

18   at 1573. If a fee agreement is challenged, it is the attorney's burden to establish that the agreement

19   is fair and reasonable to the client. *See* Cal. Prac. Guide: Prof'l Responsibility § 5.215(a) (citing

20   Cal. State Bar Form. Opn. 1994-135). On this record, a $725 hourly rate is unreasonable.

21   Limiting Mr. Friedman to his contract rate of $450 yields a lodestar of $678,150 (assuming the

22   full 1,507 hours that Mr. Friedman claims). If one assumes a substantial fee increase to $600 an

23   hour, and discounting the 1507 overall billing hours by 10 percent under *Moreno*, the result is

24   $813,780. And the lodestar is $666,360 if one multiplies $600 by the lodestar hours of 1110.6

25

26   ───────────────
     [183] Retainer Agreements — ECF No. 265-4 at 3, 7, 11, and 15.

27   [184] Clients' Decls. — ECF No. 284-3 at 5, 7, 10, 13, 16. The record contains a July 2013
     declaration with a claimed hourly rate of $785. (Friedman Decl. — ECF No. 182-11 at 17.) That
28   apparently is the disclosure of the rate increase to the plaintiffs.

United States District Court
Northern District of California

from the previous section. These approaches demonstrate that the fees Mr. Friedman received — $███ in settlement plus $███ from Ms. Hill for a total of $███ — are reasonable under a lodestar analysis.

Second, as discussed in the previous section, the billing records reflect that partner-level attorneys performed all tasks in this case, including reviewing ECF notices and preparing proofs of service, to name some mundane examples.[185] The examples are recounted in the previous section, and a review of the billing records shows them. It is not reasonable to apply an across-the-board partner rate to partners who conduct clerical and other lower-level tasks. That would be grounds to reduce the hourly rate on a task level.

These factors end the analysis. The court thus does not reach the issue whether — under different circumstances — $725 would be a reasonable hourly rate for Mr. Friedman.[186]

### 3.3   The Fees Are Reasonable

In sum, the court concludes that Mr. Friedman received his reasonable fees.

Mr. Friedman nonetheless maintains that the award is unreasonable, characterizing it as '███ ███.'[187] This is based on the effect of the multiplier. Mr. Friedman elaborated on this at the hearing. The three plaintiffs' attorneys demanded a collective $4.3 million as part of the settlement negotiations; this was based on a lodestar of $2.15 million and a multiplier of two.[188] The fee that Mr. Renneisen and Ms. Tanacea negotiated for the three plaintiffs' lawyers was roughly $███.[189] They did not stand on the multiplier; Mr. Friedman maintained his entitlement to it though he would have accepted something less than a multiplier of two.[190] And if

---

[185] *See, e.g.*, Friedman Billing Records — ECF No. 265-12 at 16, 19, 21, 22.

[186] *See, e.g.*, Dardarian Decl. — ECF No. 266, ¶ 14.

[187] Friedman Decl. — ECF No. 278-4, ¶ 46. The math boils down to, $███ is roughly █ of the lodestar with a multiplier of 2.0, which results in Mr. Friedman's initial claim of $2.3 million. *See supra* page 13 & n.78.

[188] Hearing Transcript (8/18/2016) — ECF No. 334 at 105:1–22.

[189] *Id.* 105:22–23.

[190] *Id.* 90:18–19 & 22–23, 105:18–23.

United States District Court
Northern District of California

Kaiser did not want to pay "enough to satisfy [him], there may not have been a settlement."[191] Mr. Friedman similarly said in his declaration that there would be no settlement unless — after the negotiation of the programmatic relief and damages — he agreed to the amount of fees.[192]

But the analysis now is under the lodestar. For all of the reasons in this order, the $███████ in settlement is reasonable under a lodestar analysis. It is more so when one considers that Mr. Friedman received $██████ from Ms. Hill for a total of $███████.

The court also considers the total fee award here in evaluating reasonableness. The settlement was $██████; $█████████ to the plaintiffs and $██████████ (including $████████ in costs) to the three attorneys.[193] This is a substantial fee award for a case with two motions to dismiss, one discovery motion, the plaintiffs' depositions, Rule 30(b)(6) depositions, and document review and data analysis. The fees collectively are the reasonable statutory fees for all three attorneys.[194]

At the hearing, Mr. Friedman disputed that the court should consider Mr. Renneisen's and Ms. Tanacea's hours because they compromised their fees.[195] But the reasonableness of hours he spent necessarily is entwined with the hours that others devoted to the case. Moreover, Mr. Friedman is pursuing fees from clients who have expectations about their fee exposure based on the (voidable) fee agreements. The fee agreements refer collectively to "Attorneys" (plural) and contemplate that Mr. Friedman could associate other attorneys, as he did here. Section 6 — which imposes responsibility for the lodestar if the plaintiffs waived fees in a settlement agreement — defines the obligation as one to the "Attorneys," not just Mr. Friedman.[196] The overall settlement to the attorneys exceeds anything that the plaintiffs reasonably would expect to pay in Section 6.

---

[191] *Id.* 91:24–92:2.

[192] Friedman Decl. — ECF No. 278-4, ¶ 41.

[193] Settlement Agreement — ECF No. 182-5, ¶ 2.

[194] The attorneys collectively claimed 2,856.4 hours (1507 + 1100.1 + 248.3). *See supra* Statement Section 5.2.

[195] *See* Hearing Transcript (8/18/2016) — ECF No. 334 at 93–94, 103–105.

[196] *See* Retainer Agreements — ECF No. 265-4 at 3, 7, 11, and 15.

*(left margin, vertical text)* United States District Court Northern District of California

Mr. Friedman also argues that the plaintiffs did not identify issues or present evidence on the reasonableness of time spent, and that the court thus should not reduce his hours.[197] The court disagrees. The plaintiffs identified the deficiencies. The court's obligation is independent. Any trial court's knowledge of litigation drives its assessment of the reasonableness of counsel's hours. A court's particular understanding of the litigation — the case-management conferences, the discovery, the negotiations of settlement — give it discretion to reduce the number of billable hours awarded. The court has that understanding here, both from the docket and the litigation points that it shows and from the 45 hours spent in settlement negotiations.

Moreover, the billing records show only a modest exercise of billing judgment: two examples in 2011 (when the court did not reduce time at all); 18 hours for review of billing records; and 7 hours for analyzing settlement issues.[198] There is Mr. Friedman's assertion that he exercised billing judgment by not recording time, but the court does not see it, either with litigation and, more fundamentally, during settlement negotiations. *Cf. Moreno*, 534 F.3d at 1113.

### 4.  Other Issues

Mr. Friedman disputes Ms. Tanacea's account of his actions, particularly her charge that he said he would "ramp up" his billing in May.[199] He asks for an evidentiary hearing if the court credits her explanation at his expense.[200] Mr. Friedman explains that he did not mean he would engage in "unreasonable make-work" and meant only that there was work to do and he would take the laboring oar now that he was finished trial in Boston.[201] The court does not discredit either perspective: people have different information, they interpret information that they have differently, and they interpret other people's intentions.[202] Mr. Friedman's disagreement with Ms.

---

[197] Reply — ECF No. 316-2 at 14–16.

[198] Friedman Billing Records — ECF No. 265-12 at 1, 17, 53–54, and 62–63.

[199] Reply — ECF No. 316-2 at 18–19.

[200] *Id.*; Friedman Supp. Decl. — ECF No. 324-5, ¶ 3.

[201] *Id.*

[202] D. Stone, B. Patton, & S. Heen, *Difficult Conversations: How To Discuss What Matters Most*, at 18 (Penguin Books, Nov. 2, 2010).

United States District Court
Northern District of California

Tanacea ultimately is not relevant to the court's decision. The court reaches its conclusions based on the record of the litigation and settlement negotiations, the billing records for all counsel, and Mr. Friedman's declarations. The court denies Mr. Friedman's request for an evidentiary hearing as unnecessary.

Mr. Friedman objects to the plaintiffs' declarations.[203] The declarations report facts about duplicate, signed fee agreements and notice of fee increases. The information is relevant and based on the plaintiffs' personal knowledge. The court denies the objection.

Mr. Friedman objects to the submission of the BASF award.[204] It was the precursor to his state case, which now is stayed because Mr. Friedman asked the court to assert ancillary jurisdiction to resolve the fee dispute. The BASF award is relevant procedural context about the fee dispute and the issues that the parties raised in their briefs. The court otherwise does not rely on the BASF award. The court overrules the objection.

Mr. Friedman asked to submit supplemental briefing.[205] The fact record is complete, and all legal issues were addressed in the many briefs. The court denies the request as unnecessary.

### CONCLUSION

The court denies Mr. Friedman's motion for additional fees.

**IT IS SO ORDERED.**

Dated: September 19, 2016

LAUREL BEELER
United States Magistrate Judge

---

[203] Reply — ECF No. 316-2 at 19.

[204] *Id.*

[205] Request to File Supp. Brief — ECF No. 333.

ORDER (No. 10-cv-02833-LB)                45